STATE EX REL. CITY OF MILWAUKEE, Respondent, vs. MILWAUKEE ELECTRIC RAILWAY & LIGHT COMPANY, Appellant.

*November 21, 1912—January 7, 1913.*

*Street railways: Franchises: Duty of city council in granting: Construction: Requirements: Repairing portion of street: Repaving: Consolidation of companies: New franchise preserving requirements of prior ones: Practical construction: Estoppel.*

1. In granting a franchise for a street railway a city council acts as a trustee for the public, and it is its imperative duty to guard the public interests in every way reasonably within its power.
2. If the franchise granted contains stipulations or provisos evidently intended to protect the public interests, it will be assumed that they were inserted to secure and conserve for the public advantages which are valuable and substantial, rather than trifling and inconsiderable; and if the language used be equally capable of two constructions, that which safeguards the public interest substantially must be given preference to that which secures only an insignificant or unsubstantial advantage.
3. In a franchise running for thirty-seven years, a provision that the railway company "shall keep and maintain in good and

thorough repair during the continuance of said term" that por-
tion of the street lying between the outside rails of the tracks,
and one foot on either side thereof towards the curb line, "of
the same material as that of which the said street shall be
composed at any time when such repairs shall be necessary,"
means that the company is to keep a certain part of the street
in repair, and that when a given pavement becomes defective
and unsafe the company must renew that portion of the pave-
ment within its zone, using the same material which the city
uses in the remaining portion of the street. *Blount v. Janes-
ville,* 31 Wis. 648, distinguished.

4. Upon consolidation of street railway companies operating in a
   city under separate franchises, a new franchise ordinance was
   passed by the council, extending to a uniform date the previous
   franchises, granting the use of additional streets, and contain-
   ing certain uniform provisions as to repair of streets and pave-
   ments, but declaring that all rights reserved or secured to the
   city by the prior ordinances, relating to the laying of tracks
   "and everything connected with the exercise of the rights
   hereby or heretofore granted to said railway company and its
   predecessors, are hereby reserved to the city the same as though
   this ordinance had not been passed," and further that the pro-
   visions of the prior ordinances "so far as any or either of them
   relate to . . . the occupation and use of streets, bridges and
   public places, and the repairing, replacing, strengthening and
   maintaining the same . . . shall not be construed or deemed to
   be repealed hereby, but shall be and remain in force with the
   same effect as though this ordinance had not been passed."
   *Held,* that the provisions of the prior ordinance above stated
   (in No. 3) continued in force, unimpaired by the new ordi-
   nance.

5. Where there is no ambiguity in an ordinance or statute the doc-
   trine of practical construction has no application.

6. The fact that after the passage of the new ordinance the city
   required the company to make repairs under its provisions
   could not estop the city from enforcing the broader and more
   comprehensive requirements, if any, contained in the prior or-
   dinances, which still remained in force in addition to the re-
   quirements of the new ordinance.

APPEAL from a judgment of the circuit court for Milwau-
kee county: F. C. ESCHWEILER, Circuit Judge. *Affirmed.*

This is an action of *mandamus* brought on relation of the
city of *Milwaukee* to compel the defendant company to pave
with asphalt pavement on a concrete foundation that portion

of Walnut street in said city lying between the outside rails of its double track and one foot on either side thereof.    From a judgment awarding a peremptory writ in accordance with the petition the defendant appeals.    The material facts are simple and practically undisputed.    June 6, 1887, the city by ordinance granted to the Milwaukee City Railway Company, the defendant's assignor, the right to lay and operate a double-track street railway upon Walnut street, which ordinance contained the following provision:

"Section 4. The rights and privileges accorded by this ordinance shall remain and be in force up to the first day of July, 1924, unless sooner terminated by law, and said railway company shall keep and maintain in good and thorough repair during the continuance of said term, at its own costs and charge, all the portion of said Walnut street lying between the outside rails of the tracks hereby authorized to be laid, and one foot therefrom, towards the curb line, of the same material as that of which the said street shall be composed at any time when such repairs shall be necessary."

The tracks were laid and the railroad operated thereon pursuant to this ordinance.    At some time after the passage of the ordinance the street was paved from curb to curb with a wooden block pavement.    Prior to January, 1900, this franchise, with others of a similar nature on other Milwaukee streets, had been purchased by the defendant with the purpose of combining all the street-car lines in the city into one system, and the city council of *Milwaukee* on January 2, 1900, passed an ordinance entitled:

"An Ordinance authorizing the *Milwaukee Electric Railway & Light Company* to construct, maintain and operate street railways in the city of *Milwaukee* over and along the streets, highways, bridges and viaducts named herein, and providing for a uniform and concurrent date for the termination of all franchises and right of ways heretofore or hereby granted to said company, or to its predecessors and assigns and providing for the rates of fare to be charged and for certain transfer privileges."

By sec. 1 of this ordinance permission was given to the defendant to lay tracks and operate street cars thereon "on those streets in the city of *Milwaukee* and in the manner and upon the conditions herein set forth."

Secs. 2 and 3 are as follows:

"Sec. 2. The poles of said railway company are to be placed or replaced according to a plan submitted to and approved by the board of public works; provided, however, that said board shall have the right to change the location of poles as indicated on the plan so submitted, and all poles to be placed or replaced according to the said approved plan and under the supervision and direction of the said board of public works. The track of the said railway shall be of the gauge of not more nor less than four feet eight and one-half inches, and shall not be elevated above nor depressed below the established grade of the street. It shall be laid with modern improved rails, as approved by the board of public works, and in such manner that carriages and other vehicles can easily and freely cross said streets at any and all points and in any and all directions, without obstruction, and shall be laid as near the center of said streets and as near together as practicable. It shall be the duty of said railway company at all times to keep in good repair the roadway between the rails and for one foot on the outside of each rail as laid, and the space between the two inside rails of its double tracks with the same material as the city shall have last used to pave or repave these spaces and the street previous to such repairs, unless the said railway company and the board of public works of said city shall agree upon some other material, and said company shall then use the material agreed upon. Said railway company shall operate thereon street railway cars and carriages by means of power produced by electricity conducted upon wires suspended over and above its tracks, or such other power as may be agreed upon between said city and the said railway company, its successors and assigns.

"Sec. 3. All rights reserved or secured to said city by and under all ordinances now in force or the laws of Wisconsin relating to regulating the speed and headway of cars, the time that cars shall be operated each day, the laying of tracks, stringing of wires, and the use and operation of all

cars and tracks and everything connected with the exercise of the rights hereby or heretofore granted to said railway company and its predecessors, are hereby reserved to said city the same as though this ordinance had not been passed, and the same shall extend and apply to all franchises hereby granted except as herein otherwise expressly provided."

By sec. 4 permission is granted to occupy and use for street railway purposes, in addition to the streets already occupied, a considerable number of streets and parts of streets, with certain provisos and stipulations as to the use of viaducts and bridges and as to the extension of lines within the city limits, which are not material here.

By sec. 5 all the rights and privileges conferred by the ordinance are declared to extend to December 31, 1934, and all the rights and privileges theretofore conferred upon the company or its assignors are extended to the same date.

By sec. 6 rates of fare and transfer privileges are regulated; by sec. 7 all rights previously conferred by the city on the defendant and its assignors are confirmed; and by sec. 8 the defendant agrees to furnish electric power to swing all the swing bridges in the city crossed by the company.

Secs. 9 and 10 are as follows:

"Sec. 9. Whenever the said city shall determine to pave or repave any street upon which street-car tracks are or shall be situate, the board of public works shall give notice thereof to said railway company, and thereupon said railway company shall immediately make all such repairs, connections, conduits and improvements as it shall then deem necessary for the use and operation of its tracks and railway; after any such street shall be paved by said city the pavements thereon and the pavements upon any and all streets heretofore paved by said city shall not be opened or disturbed by said railway company for any purpose whatsoever, except by permission in writing therefor signed by the mayor and the members of the said board of public works. And whenever any such permit shall be given the city engineer shall promptly give plans and specifications for opening and closing the pavement, and said rail-

way company shall do such work according to such plans and specifications and under the supervision of said board of public works and city engineer and to their satisfaction, and said board shall have power to employ necessary and competent inspector or inspectors to actively superintend the work, and his compensation shall be paid by said railway company; and if said railway company shall fail or neglect or refuse to properly replace or repair any pavement so opened the city shall have the right to replace or repair the same by and under the direction of said board of public works, and said railway company shall pay the actual cost and expense thereof.

"Sec. 10. The provisions of all ordinances now existing, so far as the same or any or either of them, relate to the use and operation of said railways, such as the removal of snow and ice therefrom, the joint use of tracks by other companies or persons, the occupation and use of streets, bridges and public places, and the repairing, replacing, strengthening and maintaining the same, the gauge, grade and elevation of tracks and the manner of constructing the same shall not be construed or deemed to be repealed hereby, but shall be and remain in force with the same effect as though this ordinance had not been passed."

The remaining sections are not material to the questions arising in this case.

Some time prior to 1911 the wooden block pavement on Walnut street, including that part within the rails of the street railway tracks, became worn out, decayed, and rotten, so that repair with wooden blocks was practically impossible, and in September, October, November, and December of that year the city laid an asphalt pavement on a concrete foundation in the street from the curb on each side to a line one foot outside of the outermost street railway track. The defendant refused to lay such a pavement between its rails or on the one-foot strip outside of its rails, claiming that it was not compelled to do so by either ordinance, and this action was commenced February 3, 1912, to compel it do so. From judgment awarding the peremptory writ the defendant appeals.

For the appellant there were briefs by *Miller, Mack & Fairchild,* and oral argument by *E. S. Mack* and *J. G. Hardgrove.*

For the respondent there was a brief by *Daniel W. Hoan,* city attorney, and *Clifton Williams,* special assistant city attorney, and oral argument by *Mr. Williams.*

WINSLOW, C. J.    There are but three questions in this case: First. Does sec. 4 of the ordinance of 1887 require the company to repave its portion of the roadway under the circumstances here present?    Second. If so, does the ordinance of 1900 repeal that section?    And third. Has the city lost any rights by practical construction or estoppel?

1. The argument for the appellant on the first proposition is that the ordinance carefully uses the word "repair" and does not use the word "repave," that the two words have very different meanings, and that a promise to repair cannot logically be held to impose a duty to repave.    The argument is not without its weight and it has received our very careful consideration.

The question is a new one in this court.    We have no precedent either to guide or constrain our minds.    We do not regard the case of *Blount v. Janesville,* 31 Wis. 648, which is somewhat relied on by the appellant, as having any substantial application.    In that case the city charter of Janesville provided, in substance, that the expense of paving a street should be chargeable to the adjoining lots and the expense of keeping in repair a street which had been already paved should be paid out of the ward fund.    It became necessary to decide in that case whether the regrading and repaving of the entire street with different material from that with which it was first paved should be called "paving" or "repairing" within the meaning of those words as used in the charter, and it was held that it must be considered as paving and not repairing.

In that case the court was faced with an alternative. The act in question must be classed either as "paving" or "repairing"—it could not be both. In the present case we are simply to determine whether a promise to keep in repair for a long period of years a portion of a street must not be construed reasonably as a promise to repave that portion when it has fallen into disrepair and the remaining portion of the street has been repaved with a different form of pavement.

The two questions are palpably very different, and we do not consider the *Blount Case* as controlling or even helpful in the consideration of the present case.

In approaching the question it is important that certain fundamental propositions should be kept in mind. In granting street-car franchises in a city the city council is not acting as a proprietor or as a private citizen acts when selling his property to another citizen, but is acting merely as a trustee for the public. The council is charged with the very responsible duty of acting for the great mass of the people, in whom in fact is vested the easement in the public streets. It is quite impracticable for the people themselves to act as a body when such questions are under consideration. The great majority of the people are so deeply engaged in their own individual concerns, and the municipal problems of a great city are so numerous and intricate, that it is impossible to adapt the methods of the New England town meeting to the government of the modern great city. The people must act through their chosen representatives. Those who are seeking to obtain franchises from the council know that they are dealing with trustees, and they know also that when they obtain the right to use the best portion of the street for a long period of years in transporting passengers for hire they obtain a most valuable privilege. If they give good service they may justly claim to be public benefactors in one sense, but the fact remains that they are doing business for private

gain upon the property of the public, and that it is only the presence of the public that enables them to do that business successfully.

So when the trustees of the public grant such valuable privileges to a corporation organized primarily for private gain, it is their imperative duty to guard the public interests in every way which may be reasonably within their power. The endeavor should be to make certain that there be secured to the public some fairly adequate return for the privileges granted. When, therefore, in such a case the franchise contains stipulations or provisos evidently intended to protect the public interests, it must and will be assumed that the council endeavored to perform its full duty, and that the stipulations and provisos were inserted for the purpose of securing and conserving for the public advantages which are valuable and substantial, rather than trifling and inconsiderable.

All the intendments must logically be favorable, rather than adverse, to the public. Plain words and plain sentences must and will be given their plain meaning; but if there be language equally capable of two constructions, that construction which safeguards the public interest *substantially* must be given preference to that construction which secures only an insignificant or unsubstantial advantage to the public.

With these principles in mind we may proceed to the consideration of the meaning of the provisions of sec. 4 of the ordinance of 1887.

It is to be noted in the first instance that the franchise runs for thirty-seven years. It must in reason have been contemplated that during that period of time there would be more than one repaving of the street necessary. Those who remember the fleeting nature of the wooden pavements which were in vogue in 1887 cannot doubt that such must have been the expectation.

Now while it is significant, as argued by the appellant, that

the ordinance nowhere uses the word "repave," it is also significant that it does not simply require the company to "repair the pavement," but instead thereof requires it to "keep and maintain in good and thorough repair during the continuance of said term" *a certain portion of the street.* The difference in meaning which may well exist between keeping a certain part of the pavement of a street in repair, and keeping a certain part of the street itself in repair, is very obvious. It can hardly be claimed, we think, that these words in the ordinance were used carelessly or unadvisedly. Again, from the last clause of the section the argument is persuasive that something more than mere incidental repair of a casual defect in the pavement was meant. By this clause it appears affirmatively that it was contemplated that there would probably be one or more entirely new pavements laid, and hence it was provided that the company in making repairs should use the same material as that of which the street should be composed *at the time.*

In effect the promise of the company is to keep and maintain its portion of the street in good repair and of the same material as that used by the city on the street.

In our judgment the whole clause, when reasonably and logically construed, means that the company is to *keep the street* in repair, and that when a given pavement becomes defective and unsafe the company must renew that portion of the pavement within its zone, using the same material which the city uses in the remaining portion of the street.

So far we have discussed the question as an original one and have reached a conclusion upon consideration of the language of the ordinance alone. This course has seemed best, not because of the absence of cases in which somewhat similar questions have been presented to the courts, but rather because differences in the wording of the clauses governing the rights in the various cases render it quite impossible to say that any given case is exactly parallel to the one

before us.   There have been many cases, however, where the general question whether an obligation to repair meant to repave has been presented to the courts, and the decisions are in much conflict.   It is said in 3 Dillon, Mun. Corp. (5th ed.) § 1276, that

"when the requirement of the statute, or of the condition of the franchise, is merely that the company shall repair the street, there is no obligation upon the company to do more than make such repairs as are required to keep the street in a safe condition for public travel, and the company cannot be compelled to pave the street, or to bear the cost thereof.   But when the company is required not merely to repair, but to keep the portion of the street occupied by its tracks in as good repair and condition as the remainder thereof, the courts have, in some instances at least, construed this obligation as requiring the company to pave the street whenever paving is necessary to bring the portion occupied by its track into as good condition as the rest of the street."

To the first of these propositions Mr. Dillon cites *Western P. & S. Co. v. Citizens' St. R. Co.* 128 Ind. 525, 26 N. E. 188, 28 N. E. 88; *Baltimore v. Scharf*, 54 Md. 499; *State ex rel. Kansas City v. Corrigan C. St. R. Co.* 85 Mo. 263; *Kansas City v. Corrigan*, 86 Mo. 67; *Hurley v. Trenton*, 66 N. J. Law, 538, 49 Atl. 518; *Norristown v. N. P. R. Co.* 148 Pa. St. 87, 23 Atl. 1060; *Philadelphia v. H., M. & F. P. R. Co.* 177 Pa. St. 371, 35 Atl. 718; and *Williamsport v. W. P. R. Co.* 206 Pa. St. 65, 55 Atl. 836.

To the second proposition he cites *State ex rel. Jacksonville v. Jacksonville St. R. Co.* 29 Fla. 590, 10 South. 590; *Columbus St. R. & L. Co. v. Columbus*, 43 Ind. App. 265, 86 N. E. 83; and *Mayor, etc. v. H. B., M. & F. R. Co.* 186 N. Y. 304, 78 N. E. 1072.

Mr. McQuillin, in his work on Municipal Ordinances, published in 1904, at sec. 577 says: "The obligation to repair has been held to require repaving; but the weight of authority appears to support the contrary rule."

Upon the same subject it is said in Nellis on Street Railways, at sec. 155 : "An obligation to keep the street in repair does not compel the company to grade or pave the street."

Neither the statement of Mr. Nellis nor that of Mr. McQuillin can be considered as entirely accurate or complete. They have attempted to compress too much into a single sentence.   The statement of Mr. Dillon is more nearly accurate, namely, that where the obligation is simply to repair, many cases hold that repaving is not included, but where the obligation is to maintain its portion of the street in as good repair as the remainder, the courts have frequently held that when the company's zone of pavement falls out of repair it must repave the same to correspond with the pavement of the balance of the street.

We think, however, that the true doctrine is more accurately expressed by Elliott on Roads and Streets (3d ed.) at secs. 987 and 988, as follows:

"Our conclusion is that where there is a clearly expressed requirement binding the company to repair, the duty is a continuing one, and the repairs must be so made as to correspond with the changed condition of the street wrought by the improvement made under the direction of the municipality. . . . To illustrate our meaning: If a street paved with wooden blocks is subsequently paved with stone, it would be the duty of the company, when it became necessary to repair after the improvement by paving with stone, to make repairs to corre-spond with the changed condition of the street.   It would not, as we interpret the rule sustained by the weight of authority, be compelled to make the new pavement, but it would be its duty, in making repairs after the new pavement was laid, to make them to correspond to the new pavement.   Any other rule would make the duty to repair practically valueless, and not only this, but it would tend to check the growth and development of towns and cities without just reason or excuse."

Such also is the conclusion reached by the cyclopedias. 27 Am. & Eng. Ency. of Law (2d ed.) 41, 42 ; 36 Cyc. 1408. The case of *Mayor, etc. v. H. B., M. & F. R. Co.* 186 N.

Y. 304, 78 N. E. 1072, seems well considered and persuasive. In that case the railroad company was required by its charter to "keep the surface of the street inside its rails and for one foot outside thereof in good and proper order and repair." At the time the charter was granted and the road constructed there was no complete pavement, but only a sort of rough macadam road.    Later the city determined to pave the entire street with granite blocks and served notice on the company requiring it to pave its zone with such blocks. ˙ It appeared that the railroad zone was not in good repair.    The question was whether under these circumstances the company was bound to lay the new pavement at its own expense in its zone. In deciding this question in the affirmative the court said:

"The question of what shall constitute keeping the pavement in the tracks of a railroad company in good order and repair is to be determined somewhat at least with reference to existing and surrounding conditions, and in our judgment it would be altogether too narrow a view to hold that where a municipality had, for sufficient reason, decided to pave a street with asphalt or other new pavement, a railroad might discharge its obligations to keep its part of the street in good order and repair by merely patching up a dirt road or some species of pavement which had become antiquated and out of condition, and which was entirely different from that adopted in the remainder of the street."

This seems to us good law and good sense.    The idea that, when the pavement of a street has become dilapidated and the city authorities have determined that a new and more enduring pavement should be put down, a street railway company which has agreed to maintain its portion of the street in repair can discharge that duty by patching up the old and perhaps out of date pavement year after year, seems little short of absurd.    So construed, the promise "to keep and maintain" the railroad zone of the street "in good and thorough repair" becomes a collection of words mighty in sound but correspondingly insignificant in effective meaning.    The result of such

a construction is that the street railway may lawfully stand in the way of the progress of the municipality by insisting on patching up an inferior kind of pavement within its zone, while the city has adopted a superior and relatively permanent pavement for the balance of the street.

We have not attempted to review the conflicting authorities on this subject which will be found cited in the text-books and cyclopedias before mentioned, because such a review would be of no value. As before stated in this opinion, there are no precedents in this court to constrain our action, and we are free to adopt and do adopt that construction of the clause in question which seems the more reasonable and just.

2. The next contention is that the provisions of sec. 4 of the ordinance of 1887 have been repealed by the ordinance of 1900, and that under the latter ordinance the company is not required to repave in any event.

We do not now express or intimate any opinion upon the question whether under the provisions of secs. 2 and 9 of the ordinance of 1900 the company is required to repave the railroad zone when the pavement has fallen out of repair.

Assuming that the section only requires repairing of existing pavements, we still do not think that the obligations imposed by sec. 4 of the ordinance of 1887 have been in any manner affected thereby.

The purpose of the ordinance of 1900 is quite plain. The defendant company had acquired by purchase the property and franchises of a number of independent companies which operated street cars in the city of *Milwaukee*. There were more than thirty separate ordinances granting railway rights, covering as many different routes, expiring at different dates, and in these ordinances the provisions as to the repair of streets by the company were expressed in very many different ways, while some ordinances contained no provisions on the subject. The defendant desired to create a complete railroad system covering the whole city out of the various fragmentary

systems, and it is evident that the city government deemed it for the public interest that such a system should exist, hence the ordinance of 1900, which granted added routes and contained uniform provisions as to the construction of roads, the repair of roadways, the extension of tracks, the duties of the company as to the widening and strengthening of the viaducts and bridges which they might use, the rates of fare and granting of transfers, and other cognate subjects.    This ordinance further provided that all the previous franchises, whatever the original date of expiration, should be extended to December 31, 1934.

It is argued that the sections of this ordinance relating to the repair of streets and pavements were obviously intended to provide an uniform system covering all the lines and to take the place of the various repair provisions of the previous ordinances, and hence must be construed as impliedly repealing them.    We have no doubt that the repair provisions of the ordinance of 1900 were intended to apply to all the lines then operated or to be operated in the future by the defendant. As to any new lines, as well as to any of the lines which were built under ordinances containing no provisions concerning the repair of streets, the provisions of the ordinance of 1900 would, of course, be the only provisions governing the subject; but would that be the result as to lines built under ordinances which, like the ordinance of 1887, contain a distinct and definite requirement not only that repairs be made when necessary, but that repaving be done when necessary?

The answer to this question must depend largely upon the other provisions of the ordinance of 1900.    If it were silent as to the rights guaranteed to the city under the previous ordinances, the argument would be strong that its provisions amounted to a codification and rewriting of the law governing the whole subject and supplanted entirely the former provisions.

Turning to the ordinance itself, however, we find what

seem to be very clear statements of the intent of the council to preserve untouched all the rights secured to the city under the previous ordinances.

By sec. 3 of the ordinance of 1900 it is declared that "all rights reserved or secured to said city by and under all ordinances now in force . . . relating to . . . the laying of tracks, stringing of wires, and the use and operation of all cars and tracks *and everything connected with the exercise of the rights hereby or heretofore granted* to said railway company and its predecessors, *are hereby reserved* to said city the same as though this ordinance had not been passed."

It is true that this is a very general reservation of existing rights, and it is quite possible that if it stood alone it could hardly be construed as effective to preserve existing requirements concerning the repair of streets which were more comprehensive than those contained in the ordinance itself. It is supplemented, however, by the more specific reservation contained in sec. 10. By this section it is provided that

"The provisions of all ordinances now existing, so far as the same or any or either of them, relate to the use and operation of said railways, such as the removal of snow and ice therefrom, the joint use of tracks by other companies or persons, the occupation and use of streets, bridges and public places, and the repairing, replacing, strengthening and maintaining the same, the gauge, grade and elevation of tracks and the manner of constructing the same shall not be construed or deemed to be repealed hereby, but shall be and remain in force with the same effect as though this ordinance had not been passed."

The provisions of sec. 4 of the ordinance of 1887 undeniably relate to the repairing and maintaining of streets. No narrow or technical construction of these saving provisions can be indulged in; the manifest intent of the council must be given effect. We can see no doubt that sec. 10 of the ordinance of 1900 in plain terms preserves the rights secured to the city by the prior ordinance, and hence that the requirements of sec. 4 of the ordinance of 1887 still exist unimpaired

by any of the provisions of the ordinance of 1900, even if it be assumed that the latter provisions are less comprehensive than the former.

3. Upon the trial the defendant offered to prove that since the passage of the ordinance of 1900 the city had uniformly construed the same as uniformly applicable to all streets on which cars were operated, and demanded that repairs be made according to its terms on streets which under the original ordinances were not required to be repaired by the company; also that the defendant company had acceded to these demands and made the repairs asked by the city.

This testimony was excluded, and it is claimed that this ruling is erroneous for the reason that such testimony would have shown a practical construction by the city authorities of the doubtful or ambiguous provisions of the ordinance of 1900, and would also have shown that the city has estopped itself from claiming a different construction for that ordinance. We do not regard either contention as sound.

As to the first contention, we may say that the ordinance of 1900 does not seem to us ambiguous in this respect. It definitely provides that all rights secured to the city by previous ordinances with regard to the repairing, replacing, and maintaining of streets are preserved in full force. Where there is no ambiguity there is no room for the doctrine of practical construction.

Nor do we see how estoppel results from the fact that the city has required the company to make repairs under the provisions of the ordinance of 1900 since the passage thereof. As we have before stated, the provisions of that ordinance undoubtedly apply to all streets, but if, as to any streets, there be more comprehensive and broader requirements in the former ordinances, they still remain in force, in addition to the requirements of the ordinance of 1900.

*By the Court.*—Judgment affirmed.