CHICAGO & MILWAUKEE ELECTRIC RAILWAY COMPANY,
  Appellant, vs. PUBLIC SERVICE COMMISSION and others,
  Respondents.

*March 9—April 12, 1949.*

552

*Edgar L. Wood* and *John H. McQuaid,* both of Milwaukee, for the appellant.

For the respondents Public Service Commission and the city of Milwaukee there was a brief by *Walter J. Mattison*, city attorney, *William A. Ketterer,* assistant city attorney, and *Ward Rector* of Madison, and oral argument by *Mr. Rector*.

For the respondent Milwaukee Electric Railway & Transport Company there was a brief by *Shaw, Muskat & Paulsen*, and oral argument by *Van B. Wake,* all of Milwaukee.

WICKHEM, J.    The Railway Company is an urban street-railway corporation organized under the laws of Wisconsin. Its original franchise was dated February 26, 1906, and subsequently amended by ordinances of October 14, 1907, and May 25, 1925.    At the time of the petition which initiated these proceedings the Railway Company operated a double-track street-railway line from Oklahoma avenue in the south portion of Milwaukee northward along South Fifth street to West Madison street, thence in a northwesterly direction to the intersection of South Sixth and West Scott streets.    The lines proceeded thence north on South Sixth street over the Sixth street viaduct to the intersection of North Sixth, West St. Paul avenue, and West Clybourn street.    They then proceeded east on West Clybourn to North Fifth street, north on Fifth to West Wells street and east on Wells street to North Second, and thence south on North Second to the end of the line at West Wisconsin avenue.    Prior to and at the time of the institution of urban street-railway service by the Railway Company the Transport Company operated, as a part of a general street-railway system in Milwaukee, a line commencing on the south at Cleveland avenue, thence north on South Sixth street to West Mitchell, thence east on West Mitchell to South First street, thence north and west over various streets through the downtown section of Milwaukee to North Sixtieth and West Vliet street.    See the diagram printed herewith.

PROPOSED

S. 6TH ST. GASOLINE BUS LINE

KEY

STREET CAR LINES.
TRACK TO BE ABANDONED
TRACKLESS TROLLEY LINES
GASOLINE BUS LINES
PROPOSED GASOLINE BUS LINE
C. N. S. S. N. ELEC. R.R.

MAP SCALE 1"=600
AT 7-2-40

At the time of the first hearing the Transport Company operated a double-track streetcar line with its southern terminal at West Morgan avenue and South Ninth place proceeding north on South Ninth place to West Euclid avenue, thence east to south Sixth, north on South Sixth to West Mitchell street, thence east on West Mitchell to South First street, thence north as heretofore indicated. As a part of the proceeding initiated by the city of Milwaukee the Transport Company asked for permission to abandon these rail operations provided authority was granted to operate gasoline motorbuses over the same route from the southern terminus to West Mitchell street and thence north on South Sixth street to West Scott street. From the intersection of Sixth street and West Scott street the new gasoline motorbus service route runs north on South Sixth street and North Sixth street to the intersection of North Sixth street, West St. Paul avenue, and West Clybourn street, its route coinciding to this extent with that of the streetcar line operated by the Railway Company. Thus, the effect of the order is to permit the Transport Company to operate buses on Sixth street from West Scott street to the intersection of North Sixth street, West St. Paul avenue, and West Clybourn street, in spite of the fact that for years the Railway Company had operated its streetcars over this street without competition from any bus line or streetcar company. It is this portion of the order that is objectionable to the Railway Company.

On December 10, 1934, the Railway Company surrendered its franchise pursuant to secs. 193.33, 193.34, and 193.35, Stats., and accepted in lieu thereof the indeterminate permit under which it now operates. On June 28, 1947, in accordance with the permission granted by the order here appealed from, the Transport Company instituted gasoline motorbus service over the new route including Sixth street and the Sixth street viaduct. Since that time the Railway Company

asserts that there has been a material decrease in its revenues in spite of the fact that the order conditions the provision by specifying that the Transport Company "shall not pick up or discharge passengers on such line on South Sixth street between West Madison street and West Clybourn street, both inclusive, except at West National avenue."

The Railway Company contends that the order appealed from, as well as the judgment of the court below affirming it, violates its constitutional rights, is in excess of statutory authority, is based upon unlawful procedure, is unsupported by substantial evidence, and is arbitrary and capricious.

In support of these general contentions it is first urged that the rights of the Railway Company under its indeterminate permit cannot be impaired, diminished, or destroyed by any action on the part of the city of Milwaukee or of the Public Service Commission which diminishes the value of its rights and property without compensation; that the right of the city to acquire the property of the Railway Company without condemnation under sec. 193.36, Stats., estops the city from diminishing and impairing and destroying the value of property which it may later buy. Reliance is had upon *Wisconsin Power & Light Co. v. Beloit,* 215 Wis. 439, 254 N. W. 119, in which this court said (p. 451):

"The law permits a city to take over in its entirety the plant of a public utility so operating therein if it desires to do so by following the statutory procedure therefor. But it does not permit a city to do so piecemeal by first destroying the property of the existing utility devoted to and its franchise for municipal service and then, after it has by this means depreciated the value of its franchise for private service, take over that franchise and the plant and equipment devoted to that service at its depreciated value, as it might do if the contentions of the defendant herein are sustained." See also *Wisconsin P. S. Corp. v. Public Service Comm.* 230 Wis. 663, 284 N. W. 582.

It is urged that the order amounts to an attempt to diminish the value of the Railway Company's franchise rights and property by setting up a competing transportation service over its route and right of way, thus diverting business and revenue from it to the Transport Company; that the effect of this is to depreciate its property in advance of any attempt to purchase it and to make applicable the doctrine of the cases above cited. It is urged that the restrictions are wholly ineffective to protect the revenue of the Railway Company; that adequate service to the public could have been insured by requiring transfers from buses or streetcars of the Transport Company to those of the Railway Company; and that there was no occasion for imposing competition upon the Railway Company.

The foregoing argument appears to be founded on the claim that the Railway Company had an exclusive franchise to carry passengers over the Sixth avenue route. This is not true for several reasons. The franchise was not in terms exclusive. The indeterminate permit for which appellant exchanged its franchise does not purport to be exclusive. As held in *La Crosse v. La Crosse Gas & Electric Co.* 145 Wis. 408, 130 N. W. 530, and *Oshkosh v. Eastern Wis. E. Co.* 172 Wis. 85, 178 N. W. 308, there is a clear distinction between street and urban railways and general utilities. Railways serve termini and use public streets. Their relationship to areas is only incidental and there is no ground for an implication that the streets are pre-empted for their sole use. Indeed, the streets are to be used by other forms of travel and there is no reason or purpose for creating a monopoly. General utilities, such as light, water, and heat on the other hand serve areas. Ordinarily a monopoly is necessary for economic and other reasons. Hence, there must be a showing that public convenience and necessity require such second utility. This is specifically required by sec. 196.50, Stats.

With respect to street railways it is apparent that as different termini increase or decrease in population the volume and conditions of travel on the public streets necessarily varies and also the demand for new and different services by street-railway and common-motor-vehicle carriers.

"The purpose of dedicating streets and highways for public use is to permit travel thereover. The means by which travel is effected is secondary, the purpose is primary. *La Crosse City R. Co. v. Higbee,* 107 Wis. 389, 83 N. W. 701. The means may change from time to time, dependent upon man's inventive genius. Not so long ago animal power was the exclusive means of travel whether used to propel the animal alone, as in walking, or in transporting passengers by means of an animal-drawn vehicle. Naturally, therefore, it was considered that streets were dedicated to the use of walking and driving only—limiting driving to animal power. With the advent of steam and electricity came other power for street travel use. Since the primary use of streets is travel—the transportation of persons and goods thereover,—any method of accomplishing that purpose in a reasonably safe, convenient, practical, and effective way constitutes a legitimate street use.

". . . We thus see that man's necessities and his ability to meet those necessities have materially changed street travel as to method though the street purpose remains the same. The use of the streets is open to all who wish to travel thereon whether for business or pleasure, whether residents or non-residents. It is to the interest of a city to make its streets convenient for the easy travel thereon of all who live within or visit it." *Milwaukee v. Milwaukee E. R. & L. Co.* 173 Wis. 400, 407, 408, 180 N. W. 339, 181 N. W. 821.

In view of the foregoing there is neither presumption nor evidence of an exclusive grant to the Railway Company. The argument that the Railway Company has had to pave and to keep the street in the vicinity of its tracks in repair, sprinkle the street, clean snow, contribute to the cost of the Sixth street viaduct, and furnish power for the operation of drawbridges does not lead to a conclusion that it has an exclusive franchise. These are simply the conditions upon which the

Railway Company is permitted to use the street and are not the conditions or indicia of an exclusive franchise. Appellant has no property rights in the street and, indeed, the city has only such control as is necessary for regulating its easement of public travel over land the fee of which is in adjoining owners. The city is a trustee so far as its power to regulate public travel is concerned and could not give a monopoly to the detriment of the traveling public. *State ex rel. Milwaukee v. Milwaukee E. R. & L. Co.* 151 Wis. 520, 139 N. W. 396. Such property rights as the Railway Company may have to its rails and equipment are not affected by this order. The operation of motor vehicles on South Sixth street does not in any way utilize property of appellant and, indeed, so far. as we can discover from the record, the buses do not run upon the portion of the street physically occupied and used by the Railway Company.

We now approach the question in the case which offers the greatest difficulty. Ch. 193, Stats., deals with street and interurban railways. Ch. 194 deals with motor transportation, that is, transportation by self-propelled motor vehicles excluding, however, trackless trolleys and vehicles operated on rails. The Transport Company was organized under ch. 180 to exercise rights and powers referable to ch. 193. Sec. 193.01 provides that, "Corporations for constructing, maintaining and operating street railways may be formed under chapter 180, . . ." Sec. 193.01 (1) provides that, "Any municipality or county may grant to such corporation, under whatever law formed, . . . who has the right to operate street railways, the use, upon such terms as it shall determine, of any streets . . . within its limits for the purpose of laying tracks and running cars thereon, . . ." Ch. 501, Laws of 1943, added to sec. 193.01 (1) the provision, "and auxiliary vehicles operated by internal-combustion engines." Prior to 1938 the Milwaukee Electric Railway & Light Company was the holder of a common-motor-carrier certificate

numbered CC12. On October 31, 1938, the Public Service Commission issued common-motor-carrier certificate CC334 to the Transport Company as part of an order approving an assignment to the Transport Company by the Milwaukee Electric Railway & Light Company of its common-motor-carrier certificate CC12. The certificate held by the Transport Company as a result of the order of October 31, 1938, authorized it to furnish service in the city of Milwaukee upon routes which were then lawfully operated by its predecessor, Milwaukee Electric Railway & Light Company, and upon such further routes as the commission might by order approve. Discontinuance of routes then operated by the Transport Company was likewise made subject to the approval of the commission. There has been no appeal from this order which by the terms of sec. 196.41, Stats. 1937, was reviewable only by an action for that purpose brought within sixty days after denial of a motion for rehearing or within sixty days after the entry or rendition of final order following the holding of such a rehearing.

Thus, at the time of the order the Transport Company had the power by its franchise to operate a street-railway company under ch. 193, Stats., and had also a motor-vehicle certificate under ch. 194 to operate buses and furnish passenger service over particular routes. There is no escape from the conclusion that the operation of the motor vehicles under the certificate was under ch. 194 and not under sec. 193.01 (1), relating to "auxiliary vehicles operated by internal-combustion engines" because the certificate antedated the presence in the statute of the foregoing references to motor vehicles.

Because of this the provisions of ch. 193, Stats., are inapplicable to the present situation. Since the Transport Company has a certificate which is unimpeachable because no appeal was ever taken from the order granting it, it has a right under ch. 194 to operate motor vehicles for the furnishing of passenger service in the city of Milwaukee and so far as this

service is concerned the provisions of ch. 193 are inapplicable. Specifically and for the foregoing reasons sec. 195.20 is not applicable. That section provides:

"Whenever, upon complaint and after hearing had, the commission shall find that public convenience and necessity require the use by one or more railroads of the tracks, wires, poles, rights of way, switches, bridges or other property belonging to another railroad over or on any street, railroad, railway, right of way, bridge or viaduct, upon or over which said railroads have a right to operate, and that such use will not prevent the owners or other users thereof from performing their public duties, nor result in irreparable injury to such owners or other users thereof, the commission may, by order, direct that such use be permitted, and prescribe a reasonable compensation and reasonable terms and conditions for such joint use."

This section does not apply because the motor-vehicle operation does not constitute the operation of a railway nor is its operation described by sec. 195.20, Stats. It is contended that sec. 194.14 makes ch. 195 applicable to motor vehicles. That provides that, "in exercising the powers conferred by this chapter, the public service commission and motor vehicle department shall be guided as to the procedure by the provisions of chapters 195 and 196 in so far as the same are applicable and not inconsistent with the specific requirements of this chapter." Sec. 195.20 has nothing to do with procedure. It is substantive in character. Sec. 194.14 does not operate to make sec. 195.20 applicable. Further than this sec. 195.20 relates to the joint use of physical property and the Transport Company here does not by its motorbus operation make any use of the physical properties of the Railway Company.

We now come to the most plausible attack upon the order involved on this appeal. The Railway Company contends that the order of October 31, 1938, was essentially one under sec. 194.25, Stats., approving the assignment of a motor-

carrier certificate and that assuming it constituted a valid permission to continue motorbus service along already established routes it reserved to the commission the power to approve of new routes and this power could only be exercised after a hearing to consider whether public convenience and necessity call for the change in route and upon a specific finding on the point supported by substantial evidence.

The latter contention is grounded upon the provisions of sec. 194.23, Stats., which provides in part:

"(1) No person shall operate any motor vehicle as a common motor carrier except in accordance with the terms and conditions of a certificate issued to and held by him and except by virtue of a permit issued to him for the operation of such vehicle. The commission, upon the filing of an application for a certificate, or for an amendment thereto involving establishment or abandonment of service at any city or village shall fix a time and place for hearing thereon. . . . The commission shall have power, as the public interest may require, upon a finding of public convenience and necessity, to issue or refuse any such certificate or amendment or to issue it for the partial exercise only of the privilege sought. The commission may attach to the exercise of the privilege granted by such certificate or amendment such terms and conditions as in its judgment the public interest may require and as are permitted under this chapter. Before granting a certificate or amendment the commission shall take into consideration existing transportation facilities in the territory proposed to be served, including common and contract motor carriers and steam and electric railways."

The point is not free from difficulty but we are of the view that the order appealed from did not grant a certificate or an amendment thereto. It was not a certificate because the Transport Company already had a certificate as a common carrier giving service within the city of Milwaukee and it was not an amendment because it did not involve the establishment or abandonment of service at any city or village. Indeed, as we read the record it did not involve any change in termini and the change of routes was all within the limits of the city

of Milwaukee. Hence, we have not such a situation as was involved in *Gateway City Transfer Co. v. Public Service Comm.* 253 Wis. 397, 34 N. W. (2d) 238. It therefore appears to us (1) that sec. 194.23 (1), Stats., is not applicable. With its inapplicability the requirement that there be a finding of convenience and necessity and that the commission take into consideration existing transportation facilities in the territory drop out as specific requirements; (2) the proceedings terminating in the order appealed from dealt not only with an application to change or establish routes of service but also with an application under sec. 196.81, for abandonment of streetcar service. This service could not be abandoned without approval of the commission and sec. 196.81 provides that in granting approval the commission may impose such terms, conditions, or requirements as in its judgment are necessary to protect the public interest. This section contains neither the requirement as to findings relative to public convenience and necessity contained in sec. 194.23, nor the requirement there made that the commission take into consideration existing transportation facilities in the territory involved. The commission is empowered to measure the terms, conditions, and requirements by its judgment as to what is necessary to protect public interest and doubtless an order which wholly failed to take into account the public interest would be subject to attack. The question is whether there is any evidence to support the judgment of the commission that the substituted bus service is a term necessary to protect the public interest. It is our conclusion that there is such evidence. There is evidence that the traffic by street railway and common carriers was more congested on South First and South Second streets than along South Sixth street; that the operation of the Transport Company vehicles on the disputed portion of Sixth street would only increase vehicular traffic by about two per cent; that it did not substantially interfere with existing traffic movements over the Sixth street viaduct except for a period of about

fifteen minutes each day. There is evidence that for customers of the Transport Company living south of the territory served by the Railway Company the changed route of the Transport Company furnishes more rapid service to the business district and more convenient access to the north side and to east and west transfer points. There is evidence that certain portions of the territory involved would obtain a measure of relief from traffic congestion and that persons using the Sixth avenue viaduct are subject to many less delays due to drawbridge openings than when they traveled over Plankinton avenue bridge. We consider that these and other facts disclosed by the record would warrant a finding of public convenience and necessity and satisfy the calls of sec. 194.18 if that were applicable. We do not labor the point or further consider the facts because in any case the record sufficiently repels the claim that the conditions to abandonment imposed by the commission are arbitrary and wholly unnecessary to protect the public interest. It appears obvious to us that the fact that in permitting the abandonment of streetcars under sec. 196.81 the commission used its general administrative powers to impose terms does not militate against its jurisdiction or the validity of the order.

It is contended by the Railway Company that the substitution of the bus route was not in fact a condition to the abandonment of the Transport Company's electric railway line and that the former must be separately considered. The order reads:

"3. That the said company be and hereby is authorized to abandon its South Sixth street electric railway line coincident with or subsequent to the institution of the above-authorized gasoline motorbus route, provided approval of the city of Milwaukee for abandonment of the portion of the line on Mitchell street is first secured."

It is argued that the permission to abandon rail operation is permissive and could be deferred for a day or a year or ten years after the institution of the bus route. This is not a fair

construction of the order which obviously merely seeks to insure that the operation of the electric railway line will not be abandoned until substituted service by motorbus is in operation.  It is apparent from the petition and the whole proceedings that the substitution of the new service was a term or condition to the abandonment of the old type of service.

*By the Court.*—Judgment affirmed.